# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HABITAT EDUCATION CENTER, DAVID ZABER,
RICARDO JOMARRON, DON WALLER, and
ENVIRONMENTAL LAW AND POLICY CENTER,**
        **Plaintiffs,**

      **v.**                        **Case No.    03-C-1023**

**UNITED STATES FOREST SERVICE,
TOM TIDWELL, Chief, U.S. Forest Service, and
TOM VILSACK, Secretary, U.S. Department of
Agriculture,**
             **Defendants.**

---

## DECISION AND ORDER

In 2003, plaintiffs Habitat Education Center, David Zaber, Ricardo Jomarron, Don Waller, and the Environmental Law and Policy Center brought this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, against the United States Forest Service and other federal officials and entities.[1] Plaintiffs challenged the Forest Service's approval of the Northwest Howell timber project in the Chequamegon-Nicolet National Forest ("CNNF").  Plaintiffs alleged that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687.

In April 2005, I found that the Forest Service violated NEPA by failing to prepare an adequate environmental impact statement ("EIS") and enjoined the project until the Forest

---

[1]For simplicity, I will refer to all defendants collectively as the Forest Service.

Service complied with NEPA. See Habitat Educ. Ctr., Inc. v. Bosworth ("Habitat II"), 363 F. Supp. 2d 1090 (E.D. Wis. 2005). On remand, the Forest Service prepared a supplemental EIS ("SEIS") that addressed the deficiencies I identified in the original EIS. In 2006, in reliance on the SEIS, the Forest Service issued a new Record of Decision ("ROD"), in which it re-approved the Northwest Howell project.

Following the preparation of the SEIS and new ROD, the Forest Service filed a motion to lift the injunction in this case. However, because the motion to lift the injunction did not attempt to show that the SEIS complied with NEPA, I denied the motion without prejudice. The parties have since filed cross-motions for summary judgment addressing the adequacy of the SEIS, and I consider below whether the Forest Service has complied with NEPA and whether the injunction should be lifted.

## I. BACKGROUND

I have extensively discussed the history of the CNNF and the background to plaintiffs' claims in other opinions. See Habitat Educ. Ctr. v. U.S. Forest Serv. ("Habitat V"), 603 F. Supp. 2d 1176 (E.D. Wis. 2009); Habitat Educ. Ctr. v. U. S. Forest Serv. ("Habitat IV"), 593 F. Supp. 2d.1019 (E.D. Wis. 2009). I will not repeat that discussion here except to note that, in bringing this action, plaintiffs express concern over the Forest Service's management of three sensitive species that inhabit the CNNF: American Pine Marten, Northern Goshawk, and Red-shouldered Hawk. They argue that the Forest Service has not adequately analyzed the potential impact of the Northwest Howell project on the habitat of these species.

2

## II.  STANDING

The Forest Service argues that plaintiffs did not have standing to seek the original injunction in this case and that, even if they did, they do not currently have standing to oppose the Forest Service's motion to lift the injunction.  To show that they have standing to seek injunctive relief, plaintiffs must demonstrate that they are under threat of suffering an injury-in-fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.  See, e.g., Summers v. Earth Island Inst., __ U.S. __, 129 S. Ct. 1142, 1149 (2009). Two of the five plaintiffs are organizations, and for these plaintiffs to establish standing, they must show that they each have at least one member that has standing to seek injunctive relief.  Id.

Before I enjoined the Northwest Howell project, plaintiffs submitted affidavits showing that the individual plaintiffs and the members of the organizational plaintiffs regularly visited the CNNF and the Northwest Howell project area, and that the Northwest Howell project would harm their professional and recreational interests in the area.  (Ex. 2 to Docket Entry #39.)  Further, plaintiffs recently filed supplemental affidavits indicating that they continue to visit the CNNF and the project area and that the present iteration of the Northwest Howell project would harm their professional and recreational interests in the area.  (Exs. 1 & 2 to Docket Entry #216.)  These affidavits satisfactorily demonstrate that plaintiffs have personal stakes in this lawsuit sufficient to warrant their invocation of federal court jurisdiction.  Summers, 129 S. Ct. at 1149.    Therefore, plaintiffs have

3

standing to oppose the Forest Service's request to lift the injunction against the Northwest Howell project.

### III.  DISCUSSION

**A.     Standard of Review**

When an agency's decision is challenged under the APA based on the agency's failure to comply with NEPA, the standard of judicial review is a narrow one.  Highway J Citizens Group v. Mineta, 349 F.3d 938, 952 (7th Cir. 2003).  The court is not empowered to examine whether the agency made the "right" decision, but only to determine whether, in making its decision, the agency followed the procedures prescribed by NEPA.  Id. (NEPA "'does not mandate particular results, but simply prescribes the necessary process.'")

In the present case, plaintiffs argue that the Forest Service did not comply with the procedures required by NEPA because it did not prepare a satisfactory EIS before approving the Northwest Howell project.  NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  An EIS is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment."  Highway J, 349 F.3d at 953.  Requiring an agency to prepare an EIS serves two purposes.  First, "'[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" Dep't of Transp. v. Public Citizen, 541 U.S. 752, 768 (2004) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989))

4

(alteration in original).  Second, "it 'guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" Id. Thus, the agency must "articulate why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997). The EIS must show that agency officials have "[thought] through the consequences of – and alternatives to – their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." Id.  Stated differently, the agency must demonstrate that it "has taken a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).  However, "[w]hat constitutes a 'hard look' cannot be outlined with rule-like precision," Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 185 (4th Cir. 2005), and it is a standard that "is not susceptible to refined calibration," Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (internal quotation marks and citation omitted).  Rather than apply a rigid standard, a court must make a "pragmatic judgment" as to whether the agency has fostered the two principal purposes of an EIS: informed decisionmaking and informed public participation.  Id.

In making its pragmatic judgment, a court must be careful not to "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon Soc'y, 422 F.3d at 186.  With a document as complicated and mired in technical detail as an EIS, it will always be possible to point out some potential defect or shortcoming, or to suggest some additional step that the agency could have taken to improve its environmental analysis.  An EIS is unlikely to be perfect, and setting aside an EIS based on minor flaws that have little or no impact on informed decisionmaking or

5

informed public participation would defy common sense. Thus, rather than getting bogged down in possible technical flaws, a court must "take a holistic view of what the agency has done to assess environmental impact." Id. Further, courts must remember that it is the agency, and not the court, that has the technical expertise required to perform the environmental analysis in the first place. This means that judicial review of an EIS must be deferential, especially when it comes to the scientific and technical details that make up the heart of the analysis. Citizens for Alternatives to Radioactive Dumping v. Dep't of Energy, 485 F.3d 1091, 1098 (10th Cir. 2007) (judicial deference is "especially strong" where decision involves technical or scientific matters within agency's area of expertise). Of course, deferential review does not mean no review, and courts must ensure that agencies carry out their duties under NEPA, make reasoned choices, and provide a discussion that fully and frankly explains the environmental consequences of a proposed action. However, to strike a proper balance between deference and a "searching and careful" inquiry, Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989), a court may invalidate an EIS only if, after first learning what is going on so that it does not decide on the basis of superficial beliefs and assumptions, the court is firmly convinced that an error or omission in the EIS has defeated the goals of informed decisionmaking and informed public participation. Cf. Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 803 (7th Cir. 1987). Again, this standard of review is not precise, but requires that the court exercise good judgment.[2]

_____

[2]Some courts have described this standard as applying a "rule of reason," under which the court asks "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." See, e.g., Churchill County, 276 F.3d at 1071 (internal quotation marks and citation omitted); see also Ecology

6

With this standard in mind, I turn to plaintiffs' arguments.

**B.    Analysis of Cumulative Impacts**

Plaintiffs' fist two arguments are addressed to the discussion of cumulative impacts in the SEIS.  Regulations promulgated by the Council on Environmental Quality ("CEQ")[3] require that an EIS include a discussion of environmental impacts, including impacts that are direct, indirect and cumulative.  40 C.F.R. § 1508.25.  "Cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  A proper cumulative impacts analysis will assess the proposed action in light of other activity that has affected or will affect the same environmental resources. The goal is to highlight any environmental degradation that may occur if the minor effects of multiple actions accumulate over time.  For example, although a single forest project might have minimal environmental consequences, combining that project with those that preceded it and others that are anticipated might reveal a more serious overall impact. Placing the project into a broader context that includes these recent and anticipated

---

Ctr., Inc. v. United States Forest Service, 451 F.3d 1183, 1189-90 (10th Cir. 2006) ("We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment.").

[3]NEPA established CEQ as an agency within the Executive Office of the President. It  "coordinates federal environmental efforts and works closely with agencies and other White House offices in the development of environmental policies and initiatives."  See http://www.whitehouse.gov/administration/eop/ceq (click "About CEQ") (last viewed Jan. 8, 2010).

7

projects helps prevent "the tyranny of small decisions."  Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act 1 (Jan. 1997), available at http://ceq.hss.doe.gov/nepa/ccenepa/ccenepa.htm (last viewed Jan. 5, 2010) (hereinafter "CEQ Guidance").

With respect to the Forest Service's cumulative-impacts analysis, plaintiffs allege the following deficiencies: (1) the Forest Service arbitrarily limited the geographic scope of the analysis to the Nicolet side of the CNNF; and (2) the Forest Service failed to discuss certain reasonably foreseeable projects that were proposed after the SEIS was drafted. I address these contentions below.

**1.      Selection of geographic area to be analyzed for cumulative impacts.**

One of the first steps in any cumulative effects analysis is to identify the geographic boundaries within which cumulative effects will be measured.  Identifying such boundaries "is a task assigned to the special competency of the appropriate agencies."  Kleppe, 427 U.S. at 414; see also Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) (deferring to agency's determination of the scope of its cumulative impact review).  Nevertheless, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary."  Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002).  "An agency must provide support for its choice of analysis area and must show that it considered the relevant factors."  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 902 (9th Cir. 2002).  Relevant factors include "the scope of the project considered, the features of the land, and the types of species in the area."  Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003).  The presence of

species habitat outside the project area is also a relevant consideration in determining the geographic scope of a cumulative impacts analysis. CEQ Guidance, supra, at 15. However, "[i]t is not practical to analyze the cumulative effects of an action on the universe"; instead, the analysis must be limited to a meaningful geographic area. Id. at 8. Thus, "the boundaries for evaluating cumulative effects should be expanded to the point at which the resource is no longer affected significantly or the effects are no longer of interest to affected parties." Id.

In the present case, the affected resources are the sensitive species within the CNNF – American Pine Marten, Northern Goshawk, and Red-shouldered Hawk. The SEIS discusses the cumulative impacts of past, present and reasonably foreseeable forest projects on the viability of these three species. SEIS at 26-35.[4] For each species, the Forest Service limited its discussion of cumulative impacts to those affecting the population of sensitive species located on Nicolet side of the forest.[5] Plaintiffs argue that because American Pine Marten, Northern Goshawk, and Red-shouldered Hawk are located on both the Chequamegon and Nicolet sides of the CNNF, the Forest Service should have considered cumulative impacts to these species on a forest-wide basis, and that therefore the analysis in the SEIS is deficient.

_____

[4]The SEIS is located in the administrative record at 000536.

[5]As explained in my prior opinions, the CNNF consists of two noncontiguous landbases, the Chequamegon and the Nicolet. See, e.g., Habitat IV, 593 F. Supp. 2d at 1021-22. A map showing the location of the two landbases is available at the CNNF website, http://www.fs.fed.us/r9/cnnf/general/onlinemap/index.html (last visited Jan. 5, 2010).

9

I conclude that the Forest Service drew reasonable geographic boundaries. The discussion in the SEIS begins by noting that, for each species, the default geographic boundary is normally the entire CNNF. SEIS at 26-35. The Forest Service then explains that it limited its detailed cumulative-effects analysis to the Nicolet side of the CNNF because the Nicolet and Chequamegon populations of each species do not interact and are independent of each other. Because the populations do not interact, the destruction of habitat on the Nicolet side of the CNNF would not threaten the viability of populations on the Chequamegon side, and vice versa. Similarly, the preservation of habitat on the Nicolet side would not benefit the populations on the Chequamegon side, and vice versa. Thus, a project conducted on the Nicolet side of the CNNF will have no impact on the viability of Chequamegon populations, and a project conducted on the Chequamegon side will have no impact on the viability of Nicolet populations.

Plaintiffs argue that even though the Nicolet and Chequamegon populations of the relevant species are independent of each other, the Forest Service must still assess the impact of the Northwest Howell project on the forest-wide population of each species. But as just discussed, the Forest Service did assess the project's impact on the forest-wide population of each species. It first concluded that the Northwest Howell project will have no impact on Chequamegon populations and that any projects occurring on the Chequamegon side of the forest will have no impact on Nicolet populations. It then studied in detail the cumulative impact of the Northwest Howell project on the only resources that will be impacted by the project – the Nicolet population of each species. Because the Northwest Howell project will have no impact on Chequamegon populations and Chequamegon projects will have no impact on Nicolet populations, informed

10

decisionmaking and informed public participation did not require an extensive discussion of Chequamegon projects or Chequamegon populations.[6]

Accordingly, I conclude that the Forest Service's choice of geographic scope for its cumulative-impacts analysis was not arbitrary and capricious.

### 2. Failure to supplement SEIS to account for certain reasonably foreseeable projects.

As indicated, the CEQ regulations require that an EIS include a discussion of the environmental impact of a project when added to "other past, present and <u>reasonably foreseeable future</u> actions." 40 C.F.R. § 1508.7 (emphasis added). At the time the SEIS for Northwest Howell was completed, the regulations did not define "reasonably foreseeable future actions."[7] However, courts have applied the "rule of reason" discussed above to the question of whether an agency should have discussed a particular future action in its EIS. <u>See</u> <u>City of Oxford, Ga. v. Fed. Aviation Admin.</u>, 428 F.3d 1346, 1353-54 (11th Cir. 2005). Thus, whether (and to what extent) the future action should have been discussed turns on the amount of discussion necessary to serve the two principal purposes of NEPA: ensuring informed decisionmaking and informed public participation. <u>Id.</u>

---

[6]Plaintiffs point out that they are concerned about the cumulative impact of timber projects on both the Chequamegon and Nicolet populations, and that therefore informed public participation required a discussion of Chequamegon populations and Chequamegon projects. Again, however, the Northwest Howell SEIS disclosed that the Northwest Howell project will have no impact on Chequamegon populations, and that therefore the project will not contribute to the cumulative impact to Chequamegon populations. To the extent that other timber projects will impact Chequamegon populations, plaintiffs can consult the environmental documents prepared for those projects.

[7]In a regulation effective July 24, 2008, the Forest Service defined "reasonably foreseeable future actions" as "[t]hose Federal or non-Federal activities not yet undertaken, for which there are existing decisions, funding, or identified proposals." 36 C.F.R. § 220.3.

Plaintiffs argue that the Forest Service failed to consider two reasonably foreseeable projects when it analyzed and approved the Northwest Howell project – Fishel and Grub Hoe. Both projects are scheduled to occur on the Nicolet side of the CNNF in the near future. The Forest Service did not discuss either of these projects in the Northwest Howell SEIS. The Forest Service contends that it was not required to discuss them because it did not have meaningful information about their environmental effects until after the draft SEIS for Northwest Howell was completed.

In my past decisions involving the CNNF, I addressed similar arguments by the parties. See Habitat V, 603 F. Supp. 2d at 1191-93; Habitat IV, 593 F. Supp. 2d at 1034-36. In those decisions, I found that the Forest Service was not required to discuss anticipated projects when, at the time the EIS governing the challenged project was issued, the anticipated projects were so inchoate that they could not be meaningfully discussed. I reasoned that even though the Forest Service may know that it plans to conduct some type of forest management project in an area at some point in the near future, the Forest Service need not discuss that project in a present EIS where the project is so nascent that the Forest Service cannot reasonably forecast its likely environmental consequences.

In the present case, I conclude that the Forest Service was not required to discuss Grub Hoe in the Northwest Howell SEIS because the record contains no evidence suggesting that the Forest Service had any meaningful information about Grub Hoe at the time it finalized the SEIS. Indeed, the project was not formally proposed until more than a year and a half after the final Northwest Howell SEIS was issued.

The Fishel project is a closer call. That project was formally proposed on March 9, 2006, six months before the final SEIS for Northwest Howell was issued. In the proposal,

the Forest Service identified the project's boundaries, stated the project's objectives, and identified the precise action it proposed to take. See R. 000063-70. The proposal even estimated the number of acres that would be affected by the project and the volume of timber that would be made available for sale. R. 000069. Thus, by September 2006, when the Northwest Howell project was approved, the Fishel project was a reasonably foreseeable future action that could have been meaningfully discussed. However, the Forest Service argues that it was not required to discuss Fishel in the Northwest Howell SEIS because the draft SEIS for Northwest Howell was issued in January 2006, two months before the Fishel project was formally proposed.

In my prior decisions, I did not need to distinguish between a draft EIS and a final EIS because both the draft and final EISs for the relevant projects had been issued before meaningful information concerning the reasonably foreseeable future actions was available. The present case presents the question of whether a final EIS must contain a discussion of reasonably foreseeable future projects when meaningful information about the environmental effects of those projects becomes available after the draft EIS is released but before the final EIS is completed.

Pursuant to CEQ regulations, "environmental impact statements shall be prepared in two stages and may be supplemented." 40 C.F.R. § 1502.9. The regulations state that most of the heavy lifting in terms of environmental analysis should be performed before the draft EIS is completed. Id. § 1502.9(a) ("The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements . . . ."). Once the draft EIS is completed, the agency must solicit comments from the public and other agencies. Id. §§ 1502.9(b) & 1503.1. The agency must then respond to comments in the

13

final EIS.  Id. § 1502.9(b).  The CEQ regulations also require agencies to "prepare supplements to either draft or final environmental impact statements" if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  Id. § 1502.9(c)(1).

The regulations thus indicate that any reasonably foreseeable projects that can be meaningfully discussed by the time a draft EIS is completed must be discussed in the draft. Further, because the purpose of the final EIS is to respond to comments rather than to complete the environmental analysis (which should have been completed before the draft was released), an agency is not automatically required to discuss projects that become reasonably foreseeable during the interim between the release of the draft EIS and the release of the final EIS.  Instead, when new information about a reasonably foreseeable project becomes available after the draft EIS is released, the question is whether the agency is required to supplement the draft statement to account for the new information.

In my earlier decisions involving the CNNF, I discussed the legal standards that courts apply when determining whether an agency is required to supplement an EIS. Habitat V, 603 F. Supp. 2d at 1193; Habitat IV, 593 F. Supp. 2d at 1039-40.  In short, an agency need not supplement an EIS every time new information comes to light.  Rather, an agency must supplement an EIS when the new information results in a "seriously different picture of the environmental landscape." Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984) (emphasis in original).

Nothing in the administrative record indicates that the anticipated environmental effects of the Fishel project will result in a serious change to the environmental landscape

14

presented in the Northwest Howell SEIS.  There is no indication that, for example, the loss of habitat that the Fishel project will cause, when combined with the loss of habitat that the Northwest Howell project will cause, will result in habitat quantity falling below desired thresholds for species viability.  Further, to the extent that the Fishel project will contribute to the cumulative impact of timber projects conducted on the Nicolet side of the forest, the Forest Service will analyze and consider that impact in the Fishel EIS – i.e., before the Fishel project is implemented and the cumulative impact is realized.[8]  Thus, the "tyranny of small decisions" will be avoided even if the Northwest Howell SEIS is not supplemented.

Accordingly, I conclude that the Northwest Howell SEIS is not invalid due to its failure to discuss the Grub Hoe and Fishel projects.

**C.    Analysis of Reasonable Alternatives**

An EIS must discuss alternatives to a proposed action.  42 U.S.C. § 4332(c)(iii). The CEQ regulations specify that the agency preparing an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).

In their initial complaint, plaintiffs did not allege that the discussion of reasonable alternatives in the Northwest Howell EIS was deficient.  However, they alleged that the EIS did not contain an adequate discussion of the cumulative impacts of the Northwest Howell

---

[8]In fact, the final EIS for the Fishel project does account for the environmental effects of the Northwest Howell project on American Pine Marten, Northern Goshawk and Red-shouldered Hawk.  See Fishel Environmental Impact Statement at 67-82, available at http://www.fs.fed.us/r9/cnnf/natres/eis/erfl/fishel/01-Fishel.FEIS.0222008.pdf (last viewed Jan. 8, 2010).

project on American Pine Marten, Northern Goshawk and Red-shouldered Hawk. I found that the cumulative-impacts discussion in the original EIS was deficient because it did not discuss the cumulative impact to each species in adequate detail. Habitat II, 363 F. Supp. 2d at 1099-1103. After I invalidated the original EIS, the Forest Service prepared the SEIS, which includes a more thorough discussion of cumulative impacts and which plaintiffs have not challenged on the ground that it contains insufficient detail. Although plaintiffs no longer object to the level of detail in the cumulative-impacts analysis, they contend that the Forest Service should have revisited its analysis of reasonable alternatives in light of its revised cumulative-impacts analysis. The Forest Service argues that because I did not find that its original analysis of reasonable alternatives was deficient, it was not required to revisit that analysis on remand.

I begin by noting that, to an extent, the Forest Service has revisited its analysis of reasonable alternatives. In the SEIS, the Forest Service analyzes the expected cumulative impact of each of four alternative proposals – one "no action" alternative and three "action" alternatives – on each species. SEIS at 25-35. These four alternatives are the same four alternatives that the Forest Service selected for detailed study in the original EIS. Plaintiffs argue that the Forest Service should have started from scratch and reconsidered all possible alternatives in light of the revised cumulative-impacts discussion, rather than limiting the revised analysis to those alternatives selected for detailed study during the original EIS process.

I conclude that the SEIS contains an adequate discussion of alternatives. Although the Forest Service did not reconsider any alternatives other than those selected for detailed study during the original EIS process, plaintiffs have not shown that the revised cumulative-

16

impacts analysis had any effect on the Forest Service's rationale for eliminating alternatives from detailed study the first time around. In the original EIS, the Forest Service gave reasons for eliminating four alternatives from detailed study, and none of those reasons had anything to do with cumulative effects. See Northwest Howell EIS at 27 (explaining that one alternative was eliminated from detailed study because it would not have permitted any timber to be harvested, another because it was not feasible, another because it would have eliminated an important aspect of the project, and another because it proposed unnecessary items).[9] Thus, although I agree with plaintiffs that the Forest Service would have been required to revisit its elimination of alternatives if the revised cumulative-impacts analysis undermined the reasons for eliminating those alternatives from detailed study, the record does not indicate that any of the original reasons have been undermined.

Plaintiffs also argue that the Forest Service violated NEPA by designating one of the four alternatives (Alternative 2) as its "preferred" alternative during the SEIS process. Plaintiffs contend that the Forest Service should have analyzed the alternatives without expressing a preference for any of them. However, I am aware of no authority prohibiting an agency from informing the public that it thinks one particular alternative best fulfills the project's purposes. Of course, the agency cannot rig the environmental analysis to make the preferred alternative look more attractive than it is or focus on the preferred alternative to the exclusion of other reasonable alternatives, but the record in the present case does

---

[9]The original Northwest Howell EIS is available on the CD located at R. 000526.

17

not suggest that the Forest Service rigged the analysis or failed to objectively evaluate the other three alternatives.

Accordingly, I conclude that the SEIS contains an adequate discussion of reasonable alternatives.

## IV.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiffs' motion for summary judgment is **DENIED** and that defendants' motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file a sur-reply brief is **GRANTED**.

**IT IS FURTHER ORDERED** that the injunction entered on April 4, 2005 is **DISSOLVED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14 day of January, 2010.


/s_____
LYNN ADELMAN
District Judge

18